## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

LA CROSSE COUNTY, individually, and on
behalf of all others similarly situated,

             Plaintiff,

   v.

TRINITY INDUSTRIES, INC. and TRINITY
HIGHWAY PRODUCTS, LLC,

             Defendants.

**Case No. 3:15-cv-00117-slc**


**AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

La Crosse County ("Plaintiff"), through its undersigned attorneys, brings this action individually and on behalf of all others similarly situated against Defendants Trinity Industries, Inc. and Trinity Highway Products, LLC (collectively "Trinity" or "Defendants") and alleges as follows:

### INTRODUCTION

1.     Plaintiff brings this action on behalf of itself and on behalf of all others similarly situated who purchased defective ET-Plus guardrail end terminals designed, manufactured, distributed, marketed, and sold by Defendants for claims under federal and state laws.

2.     Guardrails are designed to absorb the impact of a collision, thus limiting damage to vehicles and their occupants.  Products used on the National Highway System must undergo rigorous testing and be approved by the Federal Highway Administration ("FHWA"), an agency within the U.S. Department of Transportation.

3.     As part of the approval process, the FHWA requires that suppliers of these products disclose a multitude of information, including scaled drawings showing the critical

product dimensions, as well as testing and safety information.  Once a product is approved for use, its design specifications cannot be altered without additional testing and approval, which must be granted prior to use on public roadways.  State departments of transportation, and their subdivisions, generally rely on the FHWA approval process to certify products safe for use on state roadways.

4.      Defendants' ET-Plus guardrail system received an approval letter from the FHWA in 2000.  However, between 2002 and 2005, Trinity made a series of unauthorized cost-saving changes to the design and specifications of the ET-Plus.  Trinity did not disclose these modifications to the FHWA or Wisconsin Department of Transportation ("Wisconsin DOT"), nor did it seek the required approval for the modified ET-Plus or properly test units that contained these changes.  Instead of undertaking the required testing and obtaining the necessary approval, Trinity falsely certified that the modified ET-Plus was approved by the FHWA and other regulatory agencies when approval was never sought or granted for the modified unit, and continued selling the ET-Plus for installation on roads and highways nationwide.

5.      The changes to the ET-Plus are not harmless.  As addressed below, if a vehicle strikes a modified ET-Plus end terminal, the modified internal dimensions of the ET-Plus can cause the guardrail to lock up, creating a serious hazard to the vehicle's occupants.  A number of accidents involving the modified ET-Plus end terminals have resulted in serious injuries and fatalities because the ET-Plus units malfunctioned.

6.      Defendants were recently found guilty by a federal jury of having made false claims to the government regarding the safety of the ET-Plus end terminals, and cheating the federal government out of $175 million since 2006.

7.      Most states, including Wisconsin, have stopped installing the ET-Plus units, and

more than one state has announced plans to begin removing all ET-Plus units from its roadways. Purchasers of the defective ET-Plus end terminals now risk the arduous and expensive task of identifying each defective unit, independently assessing its safety and efficacy, and potentially replacing each ET-Plus installed along the nation's roads and highways.

## PARTIES

8.     Plaintiff La Crosse County is a county located in western Wisconsin, with a population of around 115,500 citizens, and covering approximately 480 square miles.  The La Crosse County Highway Department is responsible for maintenance and construction of 285 miles of county highways, and for the maintenance of all state and federal highways in La Crosse County.  Such maintenance includes including plowing, resurfacing, and installing new bridges and safety features.

9.     Relying on Defendants' false representations regarding the safety and federal approval of its product, Plaintiff has purchased and installed the defective ET-Plus guardrail systems on roads in La Crosse County. Plaintiff La Crosse County has fourteen ET-Plus end terminal systems installed on its roadways. They paid between $1540 and $2000 for each of these ET-Plus systems in purchases made in 2011, 2012, and 2014.

10.     Defendant Trinity Industries, Inc. is a Delaware corporation authorized to do business in Texas with its principal place of business located at 2525 N. Stemmons Freeway, Dallas, Texas 75207.  Trinity Industries, Inc.'s Texas agent for service of process is CT Corp System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.

11.     Defendant Trinity Highway Products, LLC is, on information and belief, a Delaware limited liability company with its principal place of business at 2525 N. Stemmons Freeway, Dallas, Texas 75207.  Trinity Highway Products, LLC's Texas agent for service of

3

process is CT Corp. System, N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.

12.     At all times relevant to this case, Trinity and/or Trinity Industries designed, manufactured, distributed, marketed, and sold a guardrail terminal known as the ET-Plus.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home state, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Plaintiff because Plaintiff resides in this district.  This Court has personal jurisdiction over Defendants because they conduct substantial business in this District, and some of the actions giving rise to the Complaint took place in this District.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Plaintiff resides in this District, and Defendants have caused harm to class members residing in this District.

## FACTUAL ALLEGATIONS

**A.      The Federal Regulatory and Approval System**

16.     The primary regulatory and industry authorities involved in the regulation of highway products include the United States Department of Transportation, the FHWA, the National Cooperative Highway Research Program ("NCHRP"), and various state departments of transportation.

17.     These organizations establish certain standards and specifications related to the

manufacture of products used on the country's roadways.  If a product is not in compliance with these standards and specifications, the manufacturer must re-qualify its products for installation on state and national highways.

18.     The FHWA, along with other state and federal agencies, is charged with establishing the crashworthiness criteria for products such as the ET-Plus.  Between 1998 and 2010, new highway safety features were required to be tested according to the NCHRP 350.[1] NCHRP 350 provides detailed requirements regarding almost every parameter of the required tests including, *inter alia*, how the tests are to be performed, requirements for test vehicles, test conditions, and the data to be collected. There are seven different crash tests that are potentially necessary to determine whether products like the ET-Plus can be used on the nation's roadways.

19.     Not only are the required tests strictly regimented, the materials that must be submitted for approval are also expressly defined by the FHWA.  Submissions that a product is crashworthy and acceptable for use on the National Highway System: "must fully identify: a) the feature(s) tested; b) the conditions and results of the testing; and, if acceptance is being sought for any variations in design or construction details or procedures from those covered in the documentation of the testing of the feature, c) the complete design, construction, and installation details and specifications for the version(s) of the feature for which acceptance is being sought."[2]

20.     The FHWA also explicitly requires two copies of a "high quality, reproducible, letter-size, engineering drawing or set of drawings  showing all pertinent details and installation requirements of the version(s) of the feature for which acceptance is being sought are to be

---

[1] After January 1, 2011, new highway safety features were evaluated according to the American Association of State Highway and Transportation Officials' Manual for Assessing Safety Hardware ("MASH"); however, equipment that had previously been approved pursuant to NCHRP was not required to be retested or certified.

[2] Background and Guidance on Requesting Federal Highway Administration Acceptance  of Highway Safety Feature attached to FHWA's Policy Memo: Identifying Acceptable Highway Safety Features available at http://www.fhwa.dot.gov/legsregs/directives/policy/ra htm

included with the request for acceptance."[3]  The drawings must be to scale.

21.     Once a product is approved for use on the highways, its design specifications cannot be altered without additional testing and approval, which must be granted before the modified product may be used on the National Highway System.  The FHWA determines which crash tests need to be run on a roadside device, like the ET-Plus, based on the type of hardware and the proposed changes. The FHWA has established three categories of changes for equipment that already have FHWA approval and a specific means to demonstrate that the new hardware is acceptable: (1) Significant modifications require additional testing pursuant to NCHRP 350 or MASH standards; (2) Non-Significant modifications where the "Effect is Uncertain" require finite element analysis acceptable under NCHRP 179 and validation of that analysis; and (3) Non-significant modifications where the "Effect is Positive or Inconsequential" require a certification by a registered professional engineer that the change has no adverse effect on crash test performance as well as an engineering report of the original crash testing and the expected effects of the modifications.[4]

22.     To ensure compliance with its requirements, FHWA's policy is to revoke acceptance if misrepresentations are made by the developer.  "Any deliberate misrepresentation or withholding of the conditions of FHWA's acceptance of a feature by the supplier of a feature will be cause for withdrawal of acceptance."[5]

23.     The ET-Plus guardrail end terminal was approved by primary regulatory and industry authorities, including the Department of Transportation, the Federal Highway

---

[3] *Id.*

[4]*See* Federal Aid Reimbursement Eligibility Process,
http://safety fhwa.dot.gov/roadway_dept/policy_guide/road_hardware/acceptprocess/#s2b

[5] Background and Guidance on Requesting Federal Highway Administration Acceptance of Highway Safety Features, http://www.fhwa.dot.gov/legsregs/directives/policy/ra.htm

Administration, and the National Cooperative Highway Research Program on or about January of 2000.  This approval was based, in part, on the design specifications provided to these authorities by Trinity.

24.     The ET-Plus was subsequently approved by the Wisconsin Department of Transportation, and its subdivisions.  This approval required Defendants to submit proof that the ET-Plus had been certified by FHWA. The Wisconsin Department of Transportation then placed Trinity's ET-Plus on its list of items approved for use on Wisconsin roadways.  The ET-Plus was removed from this list in November 2014.

25.     Plaintiff would not have purchased the ET-Plus end terminal system for its roadways had it not been on the list of items approved by the Wisconsin Department of Transportation and had it not been FHWA certified.

**B.      Trinity's ET-Plus End Terminal System**

26.     Defendants are in the business of manufacturing various highway safety and construction products, including guardrail systems for use across the United States.  Trinity designs, manufactures, distributes, markets, and sells guardrails to cities, counties, state departments of transportation, and road contractors and installers for roadway safety.

27.     Trinity uses the registered trademark name "ET-Plus" to identify its unique and patented highway guardrail end terminals.  The ET-Plus can be used at the termination of flexible barriers on the shoulder of a roadway or in a median.  Trinity currently holds the exclusive license to the patented ET-Plus, and is the only maker of these end terminals.

28.     Defendants produced the original ET-Plus guardrail end terminal from about 1999 to about 2005.

29.     This version of the ET-Plus had four basic sections: an impact head, deflector,

extruder throat, and feeder chute.  The ET-Plus end terminal was based on a previous Trinity

product, the ET-2000.  The ET-Plus included a modified extruder head, which differed from the

ET-2000 in the size and shape of its face plate and in the omission or reduction of several of its

non-structural components.

30.     The ET-Plus is mounted on standard "W beam" style guardrails, and these end

terminals are designed to absorb and dissipate energy when struck by a moving vehicle.  *See*

Figure 1 below.



**Figure 1**.  The end terminal of a standard guardrail.[6]

31.     Upon impact, the guardrail should extrude through the feeder channel and flatten

and curl out into a ribbon, thus absorbing the majority of an errant vehicle's energy without

severe impact forces that could result in life threatening injuries to the vehicle's occupants.

Figure 2 below shows the original model ET-Plus performing correctly.

---

[6]  Alex Tribou, *Lawsuit Alleges Deadly Fault at Guardrails' End*, BLOOMBERG NEWS, June 12, 2014,
http://www.bloomberg.com/infographics/2014-06-12/guardrail-design-lawsuit html.



**Figure 2.** The end terminal absorbed the energy, and the impact plate moved with the vehicle. The W beam fed through the channel, flattening into a ribbon and curling away from the road and the car.

32.     Defendants conducted the required safety tests, and submitted the ET-Plus designs, data, safety results, and other matters to the FHWA administration for approval. The ET-Plus was approved by FHWA in January 2000, and was subsequently approved by most state departments of transportation throughout the country.

33.     States and counties, such as Plaintiff, then purchased the ET-Plus units for use in guardrail systems along their roadways and highways. According to the FHWA, an estimated 200,000 ET-Plus units are currently installed across the country.

**C.     Trinity Secretly Changed the Design of the ET-Plus**

34.     Between 2002 and 2005, Trinity secretly modified certain critical dimensions of the ET-Plus. As addressed below, Trinity was required to, but did not, inform the FHWA of these changes, and the secretly redesigned product never received the approvals necessary for installation on the nation's roadways. Despite the lack of approval, thousands of the secretly redesigned ET-Plus end terminals are installed across the United States and in over 60 foreign countries. The secretly redesigned and unapproved ET-Plus terminals are illegal and fail at an alarming rate, thereby killing or maiming drivers and their passengers.

9

35.     When Trinity obtained regulatory approval of the original ET-Plus in 2000, it was required to provide FHWA and the state departments of transportation with scaled drawings that showed the critical dimensions of the product.   Those drawings show the following critical dimensions:

|  | **2000** |
|---|---|
| Exit Gate | 1.3 to 1.5 inches (usually 1.5) |
| Feeder Channel Width | 5 inches |
| Feeder Chute Assembly Height |  |
|     a.  exterior | 15 3/8 inches |
|     b.  interior | 15 3/8 inches |
| Feeder Chute Assembly Length | 37 inches |

36.     Between 2002- 2005, Trinity began contemplating cost-saving changes to the design.  In an internal email from 2004, one of Trinity's engineers estimated that changing the design of the extruder head from 5 inches to 4 inches could save the company approximately $2 for each piece, or approximately $250,000 in five years.[7] In an email on November 9, 2004, Steve Brown (then president of Trinity Highway Products) told Wade Malizia (then manager of Trinity plant 31 in Girard, Ohio), "I'd like to start pushing to chnge the ET to the 4" channel." He then asks Mr. Malizia, "How much weight to we save/each and what would be the cost savings/each (assume $.25 steel)?" Mr. Malizia then informed Mr. Brown that changing to the 4 inch channel would save "$2.00 per ET." Mr. Brown, then forwarded this information on to other Trinity employees and told them, "If wade's numbers are good, we would save $2/ET. That's $50,000/ year and $250,000 in 5 years by using the 4" channels for the legs." He then says, " If TTI agrees, I'm feeling we could make this change with no announcement. We did pretty good with the TRACC changes."[8]

---

[7] *U.S. ex rel. Joshua Harman v. Trinity Indus., Inc. et al.* ,12-cv-00089-JPG, Doc. No. 609-17 at 189:25-190:4, Doc. No. 609-18 (E.D. Tex. Dec. 4, 2014) (hereinafter "*Harman*").

[8] *Id.*

37.     Upon information and belief, sometime between January and May 2005, Steve Brown asked Wade Malizia to make an ET-Plus prototype using 4-inch wide feeder channels. He was given no direction on how to build it, and was just told to change the 5-inch channel to a 4-inch channel.[9] Mr. Malizia in turn delegated the task to the plant 31 welding shop. The welders attached 4-inch wide feeder channels to the standard extruder throat unit that Trinity had used since approval in January 2000. No engineer was involved in the process to assure that the critical dimensions of the original tested product were maintained. The prototype was never photographed, drawn, or measured.[10]

38.     Accordingly, Trinity secretly changed each of the critical dimensions set forth above. Based on measurement of numerous modified ET-Plus units, the new dimensions are:

|  | Summer of 2005 |
|---|---|
| Exit Gate | 1.0 inches |
| Feeder Channel Width | 4 inches |
| Feeder Chute Assembly Height | |
| a. exterior | 14 7/8 inches |
| b. interior | 14 3/8 inches |
| Feeder Chute Assembly Length | 36 1/4 inches |

39.     In addition to changing the width of the feeder channels from 5 to 4 inches, Trinity made, *inter alia*, the following additional changes: 1) Trinity inserted the channels approximately 3/4 inch into the extruder throat which had the effect of reducing the height of the Feeder Chute Assembly by approximately 3/8 inches because of the thickness of the metal of the Feeder Channel; 2) Trinity changed the type of weld used to connect two critical pieces of the unit – the original weld resulted in a flush fit – the new weld caused the thickness of the metal of the channel to intrude into the roof and floor space of the extruder chamber; 3) Trinity reduced

---

[9] *Id.*, Doc. No. 609-12 at 77:11-78:18.

[10] *Id.*, Doc. No. 609-5 at 136:19-137:16.

the height of the Feeder Chute Assembly by an additional 1/8 inch; and 4) Trinity shortened the length of the Feeder Chute Assembly by 3/4 inch in an attempt to reduce scrap that resulted from production and reduce costs.

40.    The effect of these changes had a pronounced effect on the internal dimensions because the steel feeder channels are parallel and by inserting them into the tapered roof and floor, they lost the benefit of the widest part of the tapered roof and floor.  Ultimately, these changes resulted in a 1 inch reduction of the internal height of the extruder channel.

41.    In this modified version, the ET-Plus impact plate, deflector, and extruder throat are generally the same as the original production version of the ET-Plus, but the feeder chute is shorter, narrower, and intrudes into the extruder throat.

42.    The changes to the dimensions of the unit, as well as the type of weld used, reduced Trinity's costs to manufacture the ET-Plus.  Moreover, after an accident, the most expensive part of the ET-Plus, the Extruder Head, could often be re-used on the unit as originally designed.  However, after making these changes to the ET-Plus, the head would not be able to be re-used as regularly or easily after an accident, thereby requiring the federal and/or state highway authorities/entities to purchase new ET-Plus units as replacements, and increasing Trinity's sales and profits.

43.    Upon information and belief, Trinity reaped significant financial benefits from these dangerous and dishonest cost-saving measures.  Indeed, Trinity's net profits have more than quintupled since 2010, bringing profits in 2013 alone to $375.5 million.

44.    These changes were not made due to any performance issues with the ET-Plus with the 5-inch channel. Trinity was not aware of any problems in the field with the 5-inch ET-

Plus at the time it secretly changed to a 4-inch channel.[11]

45.     Although required to do so, Trinity never sought approval for the secretly redesigned ET-Plus from the FHWA, nor from the Wisconsin Department of Transportation or other regulatory agencies.  Trinity did not provide scaled drawings of the modified unit to the FHWA, and did not fully test the redesigned ET-Plus pursuant to National Cooperative Highway Research Program Report 350 ("NCHRP 350").  In an internal Trinity email, a company official stated, "I'm feeling that we could make this change with no announcement."

46.     In July 2005, Trinity made a submission to the FHWA specifying eight (8) separate changes that were made to the ET-Plus system.  However, not one change to the internal or external dimensions of the extruder head was revealed to the FHWA, and the test report misrepresented that the extruder head that was tested was a standard ET-Plus terminal head (i.e. the one approved in 1999).[12]Prior to doing the May 2005 crash test on the ET-Plus system, Trinity had a call with the FHWA to discuss the tests and only told the FHWA that they were testing an increase in the height of the terminal to 31 inches, and failing to mention any other changes such as the change to a 4-inch channel.[13]

47.     Additionally, Trinity proceeded to make a number of other changes to the ET-Plus terminal head after the 2005 testing that it claims to have conducted. Trinity's manufacturing weldment drawings show that at least seven changes were made to the 4-inch ET-Plus terminal head after the 2005 testing, none of which were disclosed to the FHWA.[14]

48.     Trinity failed to disclose the full extent of the alterations to the ET-Plus system

---

[11] *Id.*, Doc. No. 609-16 at 176:2-19.

[12] *Id.*, Doc. No. 609-15.

[13] *Id.*, Doc. 609-6 at 47:24-48:8; *Id.*, Doc. 609-16 at 185:25-186:3.

[14] *Id.*, Doc. Nos. 609-31, 609-32, 609-2 at 142:10-11.

to the FHWA at any time between 2005 and 2012, including the reduction in the vertical height of the feeder channel or the change in the exit gap.[15] However, Trinity is aware that when even a minor change is made, the FHWA requires the change be completely disclosed to the FHWA before the device is put on the road.[16]

49.     In or about October of 2009, Trinity sent another design approval request to the FHWA for the ET-Plus end terminals.  That design omitted the changes Trinity made in 2005, and represented that the feeder chute still had its pre-2005 dimensions, including the 5-inch wide feeder rails that did not intrude into the extruder head.

50.     After it made changes to the ET-Plus system, Trinity continued to certify that the ET-Plus product it was selling had been tested and approved in accordance with NCHRP 350 standards.[17] Trinity has admitted that those certifications were false, and that some states removed the ET-Plus from their qualified products lists because Trinity did not disclose the changes to the product.[18]

51.     Trinity's undisclosed changes to the ET-Plus end terminal can have a significant impact on the performance of the terminal.[19] The secretly modified ET-Plus end terminal is dangerous because the guardrail no longer feeds properly through the chute due to the reduced area/dimensions of the feeder chute itself.  This causes the guardrail to "throat lock" in the head during impact.  Once throat locked, the energy of the crash is diverted elsewhere usually causing the guardrail to double over on itself or spear through a vehicle, severing limbs and killing occupants. As referenced in NCHRP 350, small changes can have very significant effects on

---

[15] *Id.; Id.*, Doc. No. 609-6 at 50:7-24.

[16] *Id.*, Doc. No. 609-6 at 52:16-52:22; *Id.*, Doc. 609-19; *Id.*, Doc. No. 609-8 at 11:8-24.

[17] *Id.*, Doc. No. 609-6 at 74:7-76:10; *Id.*, Doc. No. 609-25 at 159:15-161:11; *Id.*, Doc. No.s 26, 27, 28, 29.

[18] *Id.*, Doc. No. 609-6 at 74:7-76:10; *Id.*, Doc. No. 609-30.

[19] *Id.*, Doc. No. 609-5 at 35:21-36:8.

performance of a product.

52. Trinity was aware that the ET-Plus with a 4-inch channel had performance problems. Starting in June 2005, Trinity ran five crash tests of the ET-Plus placed on a flare (meaning not perpendicular to the roadway) and the tests failed in the same way that the four-inch terminal fails on the roads in real-world crashes.[20]

53. Figure 3 below shows the modified guardrail performing incorrectly:



**Figure 3**. The end terminal did not absorb the energy and the impact panel did not move. The W beam did not feed through the channel; instead, it bent away from the guardrail. The now spear-like guardrail can pierce the vehicle and injure the driver.

## D.    Trinity Attempted to Cover up the Dangers of the Modified ET-Plus End Terminals

54. In March 2012, Joshua Harman, a competitor of Trinity, filed a *qui tam* action, under seal, alleging that Trinity defrauded the government by not disclosing its 2005 design

---

[20] *Id.*, Doc. No. 609-5 at 62:5-67:25, Doc. No. 609-7 at 61:9-62:11, Doc. No. 609-57, Doc. No. 609-17 at 24:11-20, Doc. No. 609:16 at 207:6-16 (confirming that give tests had "horrific results" and that the cars were either speared or rolled over).

changes to the ET-Plus end terminals.[21]    In connection with the suit, Harman provided information regarding his allegations to the government.  In response to Harman's suit, the FHWA questioned Trinity about the changes it made to the ET-Plus end terminals.  Not until specifically confronted by the FHWA did Trinity turn over two sets of safety tests, including crash test videos, it performed on the modified ET-Plus system in 2005 and 2010. Trinity admitted that it never disclosed the change from a 5-inch guide channel to a 4-inch guide channel.[22]

55.    On February 14, 2012, Trinity told the FHWA that the design change was merely a "detail inadvertently omitted."  Highway officials accepted the results despite Trinity's previous nondisclosure and reports of gruesome accidents involving the altered guardrail system. In June 2014, the Federal Highway Administration issued a memorandum stating that Trinity's ET-Plus system had an "unbroken chain of eligibility" in its program since 2005.

56.    However, since that June 2014 announcement, other information casts significant doubt on the safety and status of the ET-Plus end terminals.  A study by the University of Alabama at Birmingham was published in September 2014, concluding that Trinity's modified ET-Plus end terminals were nearly three times more likely to play a role in a fatal crash than the company's previous model of guardrail.[23]

57.    Then, on October 20, 2014, a federal jury in the *qui tam* lawsuit found Defendants guilty of having made false claims to the government regarding the safety of the Defective Guardrails, and cheating the federal government out of $175 million since 2006.

---

[21] Although the case came to the public attention in mid-2014, the vast majority of the documents in the *qui tam* litigation are still under seal.

[22] *Harman*, Doc. No. 609-6 at 32:12-20.

[23] Kevin Schrum, *In-Service Evaluation of FHWA-Accepted Guardrail Terminals*, University of Alabama Birmingham School of Engineering, Sep. 11, 2014.

58.     An October 2014 follow-up study released shortly thereafter by the University of Alabama at Birmingham concluded that the modified ET-Plus system was even more dangerous than previously thought, and nearly one and a half times more likely to play a role in a crash with severe injury, and more than *four* times more likely to play a fatal crash than Trinity's previous guardrails.[24]

59.     Since news of Trinity's secret redesign, cover up, and the recent safety studies have come to light, more than 40 states[25], as well as the province of Quebec have banned installations of Trinity's ET-Plus end terminals on their roadways.  States are also looking at how to best inspect and remove existing ET-Plus terminals from their roadways.

60.     In fact, the FHWA has requested information from state Departments of Transportation regarding the performance of the ET-Plus system in the field. Such field information is important because crash tests are conducted under ideal conditions and will not mimic conditions in place on actual roadways.

61.     On November 12, 2014, the FHWA announced a revised plan to investigate and re-test the safety of Trinity's secretly modified ET-Plus system.  These tests recently took place in San Antonio, Texas, and the results are expected in early 2015.  However, the re-testing process has been sharply criticized for using older safety standards, rather than the latest, more stringent standards put in place in 2011.[26]

62.     U.S. Senators Richard Blumenthal and Charles Schumer have issued several

---

[24] Kevin Schrum, *Relative Comparison of NCHRP350 Accepted Guardrail Terminals*, University of Alabama Birmingham School of Engineering, Oct. 28, 2014.

[25] As of December 12, 2014, 42 states are confirmed to have removed the ET-Plus from their approved purchase list, including: Arizona, Colorado, Connecticut, Hawaii, Idaho, Georgia, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oklahoma, Oregon, Tennessee, Texas, Utah, Vermont, Virginia, Washington and Wisconsin.

[26] Aaron M. Kessler, *Senators Question Stringency of Guardrail Testing*, N.Y. Times, Jan. 16, 2015, http://www nytimes.com/2015/01/17/business/senators-question-stringency-of-guardrail-testing.html?_r=0.

statements both to the public and the FWHA regarding the inadequacy of the current testing methods, particularly as the current rules call for a guardrail head to be "tested from a variety of vehicle impact angles." "Serious allegations have been raised that the device is vulnerable at vehicular impacts of four to six degrees," they wrote, something using the older standard "will ignore."[27]  The FHWA has responded that further testing may occur.

63.     However, upon information and belief, as early as 2012 or 2013, but after initiation of several lawsuits against Trinity for its defective guardrails, Trinity secretly began making a third version of the ET-Plus.[28]  In October 2013, one of the original inventors of the ET-Plus technology, University of Alabama at Birmingham Professor Dean Sicking, reported to the FHWA that he had found and examined some of these third version ET-Plus units along the roadways in southeastern Arizona, which were installed between May and August 2013.

64.     According to Sicking, this new version expanded the height of the rectangular guide channel by a quarter of an inch, making the units less prone to malfunctioning.[29]  This quarter inch dimension difference between the second-version and third-version ET-Plus units exceeds Trinity's own manufacturing variation tolerance, and upon information and belief was done in response to litigation initiated against Trinity over the safety of the ET-Plus end terminals.[30]

65.     Professor Sicking reported receiving threats from Trinity after reporting his concerns about the dangerous nature of the 2005 redesign of the ET-Plus end terminals, and

---

[27] Id.

[28] Patrick G. Lee, *Company Denied Its Guardrails Turned Into Spears.  Meanwhile, Was It Making a Quiet Fix?*, BLOOMBERG NEWS, Dec. 12, 2014, http://www.bloomberg.com/news/2014-12-12/guardrails-seen-as-killers-got-quiet-fix-inventor-says html.

[29] Id.

[30] Id.

Trinity's alleged cover up.[31]  In fact, in July 2014, the court had to declare a mistrial in the *qui tam* against Trinity over alleged threats and bullying of Professor Sicking by Trinity.[32]

66.    In October 2014, the FHWA sent a letter to Trinity informing them that in response to actions taken by several states and questions raised regarding the performance of the ET-Plus system, the FHWA requested crash data from each state.[33] Additionally, FHWA ordered Trinity to perform additional crash testing of the ET-Plus.[34]

67.    In November 2014, the FHWA sent engineers into the field to investigate Professor Sicking's claims and to help determine whether more iterations of the ET-Plus end terminals are in service than the agency has been told about.

68.    The FHWA conducted crash tests using its own safety experts and an independent expert in March of 2015. The results of those tests demonstrated that serious injury to vehicle passengers legs were possible in the event of a crash involving the ET-Plus system, including femur fractures. The FHWA agreed that how the product performs in the field must be considered along with crash test results, and the ET-Plus has been shown to not operate in the field as it should.

69.    In April 2015, the United States Department of Justice ("DOJ") initiated a federal criminal investigation involving Trinity and issued a subpoena to Trinity seeking documents from 1999 onwards regarding Trinity's ET-Plus guardrail end terminals.[35] They have

---

[31] *Id.*

[32] The case was retried in October 2014, and Trinity was found guilty.

[33] *Harman*, Doc. No. 609-33.

[34] *Id.*

[35] *See* Patrick G. Lee, *Trinity Gets Subpoena in Probe of Guardrail Safety Device*, Bloomberg Business, April 29, 2015, *available at* http://www.bloomberg.com/news/articles/2015-04-30/trinity-gets-u-s-subpoena-in-probe-of-guardrail-safety-device (last visited May 26, 2015).

also subpoenaed documents from court cases involving the ET-Plus on behalf of a grand jury.[36] Although the focus of the investigation is not yet clear, investigators have interviewed potential witnesses regarding Trinity's relationship with the FHWA.[37]

70.    Senator Blumenthal from Connecticut has since written to the DOJ and DOT regarding ET-Plus guardrails and has urged them to inform the states and the public of the results of their investigation due to the safety issues implicated.[38]

71.    The attempted cover up of the 2005 redesign, through the design and sale of a third-version ET-Plus end terminal, further complicates matters for Plaintiff and other Class Members and increases the time, effort, and expense that will be required to locate, inspect, and potentially replace all affected guardrails installed on the nation's roadways.

72.    Plaintiff intends to replace all ET-PLUS end terminal systems on its roadways as soon as it has available funds to do so. Plaintiff estimates it will cost approximately $42,255.92 to replace the fourteen ET-Plus systems installed on its roads.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

73.    Upon information and belief, Defendants have known of the defects in its ET-Plus end terminals since at least 2005.  Every time Trinity sold the ET-Plus to Plaintiffs and Class members after the secret 2005 redesign, it necessarily provided a false certification that the ET-Plus conformed to the unit that had been approved by the FHWA.  As early as 2004, so contemporaneously with the concealed design modification, Trinity deliberately chose not to

---

[36] *Id.*

[37] *Id.*

[38] *See Blumenthal Urges DOJ, DOT, to Release Information and Expand Investigation Concerning Potentially Deadly Highway Guardrails*, May 8, 2015, *available at* http://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-urges-doj-dot-to-release-information-and-expand-investigation-concerning-potentially-deadly-highway-guardrails (last visited May 26, 2015).

disclose the design change from the 5-inch channel to the 4-inch channel to the FHWA, stating in an email that "I'm feeling we could make this [design] change with no announcement."[39] Clearly the failure to disclose this change was not "inadvertent" as Trinity claims.

74.     Additionally, Trinity did not disclose numerous other changes to the ET-Plus to the FHWA between 2005 and 2012, even though they were aware that disclosing such changes in order to allow for testing is required. Thus, the ET-Plus guardrail system, although it had been approved by the FHWA, was fraudulently approved because Trinity did not disclose to the FHWA the significant changes it made to the product, contrary to FHWA requirements.

75.     Plaintiff and Class Members relied on these certifications that the roadside hardware was in compliance to the U.S. government each time they made a purchase of the ET-Plus.  Since 2005, Trinity has passed off thousands of dangerous and unapproved ET-Plus end terminals as having been approved by the FHWA, and therefore, eligible for installation along state and federal roadways.

76.     Without Trinity's false certifications between 2005 and the present, the Plaintiff and Class members would not have purchased the ET-Plus end terminals, and state and federal governments would not have relied on those certifications and purchased ET-Plus units.

77.     Defendants knew well before Plaintiff and Class Members purchased the ET-Plus end terminals that the certifications were false, and concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the defects.

78.     Despite learning of guardrail failures and numerous accidents related thereto, Defendants failed to acknowledge to safety regulators that their guardrail systems are defective. Defendants did not fully investigate or disclose the seriousness of the issue, and in fact

---

[39] *Harman*, Doc. No. 609-18.

downplayed and actively hid the widespread prevalence of the problem.

79.     Any applicable statute of limitation has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

80.     As addressed above, FHWA regulations require that a manufacturer of highway safety products sell the same product as that for which approval was sought and granted.  Any modification, even one expected to have a positive effect on the product, requires additional submissions to the FHWA.  Trinity's 2005 secret redesign changes are significant and would have, if disclosed by Trinity, required additional testing pursuant to NCHRP 350 standards. Trinity did not perform that testing and fraudulently concealed the series of modifications it made on the ET-Plus end terminals.[40]

81.     Manufacturers, such as Trinity, are not merely required to sell the same product as that for which approval was granted, they are also required to certify this fact to purchasers. The FHWA standard approval letter states that the following provision applies:

> You will be expected to certify to potential users that the hardware furnished has essentially the same chemistry, mechanical properties, and geometry as that submitted for acceptance.

Trinity received this very language in FHWA's March 15, 2010 approval letter CC-12Q in response to a separate modification to the ET-Plus for which it sought approval.  In selling the ET-Plus after the secret modifications, Trinity provided false certifications that its units were the same as those approved by the FHWA.

---

[40] Trinity also did not seek approval for any variations of design that would have required  Trinity to submit "complete design, construction, and installation details and specifications for  the version(s) of the feature for which acceptance is being sought."   Background and Guidance  on Requesting Federal Highway Administration Acceptance of Highway Safety Feature, *supra*.  Nor did Trinity provide the FHWA  scaled drawings of the secretly changed ET-Plus.  Had it done so, the drawings would have shown the  extensive, additional changes.

82.     After the existence and sale of the unapproved ET-Plus end terminals were brought to the FHWA's attention in January 2012, Trinity scheduled a meeting with Nicholas Artimovich of FHWA's Office of Engineering.  At that February 14, 2012 meeting, Trinity admitted for the first time that it had shrunk the width of the ET-Plus' feeder channels from 5 inches to 4 inches; however, it failed to tell Artimovich that it also shrunk the interior vertical clearance of the feeder chute by approximately 1 inch.  Trinity further failed to inform Artimovich that it also shrunk the ET-Plus' exit gate.

83.     In the February 14, 2012 meeting, Trinity focused solely on the change to the 4 inch feeder chute, and represented that the secretly changed ET-Plus was tested successfully on May 27, 2005.  On February 28, 2012, Trinity submitted to the FHWA the test results purportedly corresponding to the May 27, 2005 test along with other materials to perpetuate the falsehood that the unit tested and approved was the same as the unit Trinity had sold for the previous seven years.  In reliance on Trinity's continuing misrepresentations, the FHWA has continued to approve the use of the ET-Plus on the National Highway System.

84.     Trinity's representation to FHWA that the modified ET-Plus end terminals were properly tested on May 27, 2005 was itself a blatant misrepresentation for several reasons.  First, the 4-inch prototype purportedly tested on that date was a one-off unit built by Trinity's welders without guidance or supervision of any designer or engineer and without a plan or drawing of what the welders should build or what they did build.  Second, even assuming the unit tested on May 27, 2005 had 4-inch wide feeder channels as claimed, Trinity made substantial changes to the design of the modified ET-Plus *after* the May 27, 2005 test, such that the versions Trinity began selling in the fourth quarter of 2005 necessarily had different specifications and geometry than the unit that was crash tested.  Third, the May 27, 2005 test was not designed to see if the

modified ET-Plus could properly withstand vehicle impact.  Instead, that test was designed to establish that the ET-Plus would work in conjunction with a 31-inch high guardrail system.

85.     In 2012 or 2013, Trinity further tried to conceal the truth by, again without notice to the FHWA, other regulatory agencies, state departments of transportation, or purchasers, selling a third-version of the ET-Plus end terminals, which attempted to correct some of the defects of the 2005 redesign.

86.     To date, Trinity continues to obfuscate and conceal its illegal and dangerous behavior.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of itself and all others similarly situated. Plaintiff seeks to represent a class (the "Nationwide Class") initially defined as:

> All persons or entities who purchased one or more defective ET-Plus guardrail system (as defined herein) in the United States.

88.     Plaintiff also seeks to represent the following statewide class ("Statewide Class") defined as follows:

> All persons and entities in the State of Wisconsin who purchased one or more defective ET-Plus guardrail system (as defined herein) (the "Statewide Class").

89.     Excluded from each Nationwide and Statewide Classes are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries any individuals who experienced physical injuries as a results of the defects at issue in this litigation, and the judge and court staff to whom this case is assigned.  Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the class should be expanded or otherwise modified.

**Numerosity and Ascertainability**

90.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  Plaintiff is informed and believes that there are hundreds of thousands of defective ET-Plus end terminals nationwide.  Individual joinder of all Class Members is impracticable.

91.     Each of the Classes is ascertainable because its members can be readily identified using sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control.  Plaintiff anticipates providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Predominance and Commonality**

92.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class Members.  These include, without limitation, the following:

        (a)     Whether the ET-Plus end terminals are defective and dangerous;

        (b)     Whether the ET-Plus end terminals have suffered a diminution of value, and pose a public danger, as a result of incorporation of the ET-Plus end terminals at issue into a guardrail system;

        (c)     Whether Defendants knew or should have known about the defects, and, if yes, how long Defendants have known of the defects;

(d)     Whether the defective nature of ET-Plus end terminals constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a ET-Plus end terminals;

(e)     Whether Defendants had a duty to disclose the defective nature of the ET-Plus end terminals to Plaintiff and Class Members;

(f)     Whether Defendants omitted and failed to disclose material facts about the ET-Plus end terminals;

(g)     Whether Defendants' concealment of the true defective nature of the ET-Plus end terminals induced Plaintiff and Class Members to act to their detriment by purchasing the ET-Plus;

(h)     Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

(i)     Whether Defendants misrepresented that ET-Plus end terminals were safe;

(j)     Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose the secret design changes to the ET-Plus end terminals;

(k)     Whether Defendants' conduct, as alleged herein, likely to mislead a reasonable consumer;

(l)     Whether Defendants' statements, concealments and omissions regarding ET-Plus end terminals were material, in that a reasonable consumer could consider them important in purchasing, installing, and maintaining such guardrails;

26

(m)     Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

(n)     Whether the ET-Plus end terminals were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

(o)     Whether Plaintiff and the Classes are entitled to a declaratory judgment stating that the ET-Plus end terminals are defective and/or not merchantable;

(p)     Whether Defendants' unlawful, unfair, and/or deceptive practices harm Plaintiff and the Classes;

(q)     Whether Defendants have been unjustly enriched by their conduct;

(r)     Whether Plaintiff and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

(s)     Whether Defendants should be declared responsible for notifying all Class Members of the defects and ensuring that all guardrail systems with the ET-Plus end terminal defect are promptly recalled and repaired;

(t)     What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy; and

(u)     How such penalties should be most equitably distributed among Class Members.

**Typicality**

93.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class Members, and arise from the same course of conduct by Defendants.  The relief Plaintiff seeks is typical of the relief sought for the absent Class Members.

27

**Adequate Representation**

94.     Plaintiff will fairly and adequately represent and protect the interests of the Classes.  Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

95.     Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so.  Neither Plaintiff nor its counsel have interests adverse to those of the Classes.

**Superiority**

96.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by the individual Class Members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class Members, which would establish incompatible standards of conduct for Defendants; and because adjudication with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members, or impair substantially or impede their ability to protect their interests.

97.     Absent a class action, most Class Members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

98.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby

28

making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

99.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The common questions of law and of fact and Defendants' conduct and responsibility predominate over any questions affecting only individual Class Members.

100.    Because the damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

101.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation.  Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

102.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court

with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

103.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the ET-Plus end terminals defects without waiving or dismissing such claims.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Declaratory Judgment Act, 28 U.S.C. § 2201 *et. seq.*
(On behalf of the Nationwide Class)**

104.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

105.    Plaintiff brings the Count on behalf of the Nationwide Class ("Class").

106.    Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (3d ed. 1998).

107.    There is an actual controversy between Trinity and Plaintiff concerning: (1) whether Trinity's ET-Plus end terminals have a defective design that cause the guardrails to throat lock during impact; (2) whether Trinity knew, or should have known, of this defective design; (3) whether Trinity concealed this information from the FHWA, state and local departments of transportation, and other customers; (3) whether Trinity knew or should have known that the modified ET-Plus end terminals were not properly tested pursuant to government

regulations; and (5) whether Trinity tried to cover up the ET-Plus defects without notice to Plaintiff and the Declaratory Relief Class about the defects, and the potential for the ET-Plus end terminals to fail as a result of the defects.

108.    Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

109.    Despite repeated failures of the modified ET-Plus end terminal, Trinity refused to acknowledge that the units were defectively designed and that they had not undergone the federally required testing or approval process.

110.    Accordingly, because of Trinity's actions, Plaintiff seeks a declaration that the ET-Plus end terminals sold after Trinity's undisclosed design changes are defective in their design, material, labeling, and warranties.  These defects cause the guardrails to throat lock during impact, and improperly disperse the energy of a crash, posing serious injury and death to drivers and their passengers.  The defective nature of the units is material and requires disclosure to all entities who have purchased a defective end terminal, as well as to the driving public, whom the guardrails were intended to protect.

111.    The declaratory relief requested herein will generate common answers that will settle the controversy related to the alleged defective design, material, labeling, and warranty of the ET-Plus end terminals sold after Trinity's undisclosed design changes and the reasons for their repeated failure.  There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## SECOND CLAIM FOR RELIEF
### Strict Liability Design Defect
### (On Behalf of the Nationwide Class)

112.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

113.    Plaintiff brings this Count on behalf of the Nationwide Class.

114.    Defendants designed, manufactured, sold, and/or distributed defective ET-Plus end terminals to Plaintiff and the Class.

115.    The ET-Plus end terminals Defendants designed, manufactured, sold, and/or distributed were defective in their design, and were defective when they left Defendants' control.

116.    Defendants knew, or should have known, that the modified ET-Plus end terminals contained a non-obvious danger in their material and design.  Defendants knew that the specifications and critical dimensions of the ET-Plus had been changed, and that such changes had not been subject to the required federal safety tests and approval process, and that consumers relied on Trinity's representations of FHWA and departments of transportation approval, without conducting an independent safety test.

117.    The performance of the ET-Plus in the field demonstrates that the product does not function as it was intended.

118.    Defendants failed to inform Plaintiff and the members of the Class as to the ET-Plus' susceptibility to failure.

119.    The modified ET-Plus end terminals designed, manufactured, sold, and/or distributed by Defendants were defective due to inadequate design, and failure to follow the FHWA and other regulatory safety processes.

120.    Defendants failed to disclose the secret design changes made to the ET-Plus, failed to subject the newly designed ET-Plus to the appropriate crash tests, and failed to disclose any of this information to the federal government, the Wisconsin Department of Transportation,

32

other appropriate regulatory bodies, or to Plaintiff, and failed to obtain the proper approval of the ET-Plus.

121.     As a direct and proximate result of the defective condition of the modified ET-Plus end terminals as designed, sold, and/or distributed by Defendants, Plaintiff and other members of the Class have suffered injuries in the decreased value of the guard rails.  The safety and feasibility of these guardrails must now be studied, inspected, tested, and potentially each unit must be replaced.

### THIRD CLAIM FOR RELIEF
**Breach of Contract**
**(On Behalf of the Statewide Class)**

122.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

123.     Plaintiff brings this Count on behalf of the Statewide Class.

124.     A valid sales contract existed between Plaintiff and Defendants, pursuant to which, Defendants offered to sell Plaintiff federally approved and NCHRP 350-compliant ET-Plus end terminals at a specified price.

125.     Defendants materially breached their contract with Plaintiff because they knowingly and falsely representing that the modified ET-Plus end terminals had been approved by the FHWA, and Wisconsin DOT, which approval was contingent on Defendants' disclosure of any and all changes to design and materials, as well as all required crash testing.

126.     These representations were false because Defendants secretly made changes to the design and manufacture of the ET-Plus units without notifying the FHWA, Wisconsin Department of Transportation, or La Crosse County, and without submitting the modified units to the required safety testing or approval process.   Defendants knew the falsity of their

representations because Trinity made the affirmative decision to both change the design of the ET-Plus end terminals and to not disclose these changes to the FHWA or others.

127.    Defendants also knew that such approval and compliance were material terms of the purchase contract.

128.    Defendants knew that Plaintiff, like the other Class Members who entered into sales contracts with Defendants, had no knowledge of those facts and that neither Plaintiff nor the other Class Members had an equal opportunity to discover the facts.

129.    As a result of Defendants' breach of contract, Plaintiff and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

## FOURTH CLAIM FOR RELIEF
### Violation of Wisconsin's Deceptive Trade Practices Act
### (On Behalf of the Statewide Class)

130.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

131.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

132.    Plaintiff brings this Count on behalf of the Statewide Class.

133.    Defendants' conduct violates the Wisconsin Deceptive Trade Practices Act, Wisconsin Stat. § 100.18 (hereinafter "DTPA").

134.    Wisconsin's DTPA prohibits a seller from making deceptive, false or misleading representations or statements of fact to prospective buyers.

34

135.    Defendants affirmatively represented to Plaintiff, the state of Wisconsin, and the public that it had properly followed the regulatory approval process, and that its ET-Plus end terminals were approved and crashworthy.

136.    Defendants' representations were untrue, deceptive, and misleading because Defendants failed to disclose the secret design changes made to the ET-Plus, failed to subject the newly designed ET-Plus to the appropriate crash tests, and failed to disclose any of this information to the federal government, the Wisconsin Department of Transportation, other appropriate regulatory bodies, and Plaintiff, and failed to obtain the proper approval of the ET-Plus.

137.    Defendants' representations materially induced Plaintiff to purchase ET-Plus end terminals for installation along the county's roadways.  The installation of these ET-Plus end terminals have caused Plaintiff pecuniary loss, as these guardrails must now be replaced.

### FIFTH CLAIM FOR RELIEF
**False Advertising**
**(On Behalf of the Statewide Class)**

138.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

139.    Plaintiff brings this Count on behalf of the Statewide Class.

140.    Defendants' conduct constitutes false advertising in violation of Wisconsin Stat. § 100.18.

141.    Defendants made public statements and representations related to the governmental approval and the safety of its ET-Plus end terminals.  These representations were untrue, deceptive, and misleading because Defendants failed to disclose the secret design changes made to the ET-Plus, failed to subject the newly designed ET-Plus to the appropriate

crash tests, and failed to disclose any of this information to the federal government, the Wisconsin Department of Transportation, other appropriate regulatory bodies, and Plaintiff, and failed to obtain the proper approval of the ET-Plus.

142.     Defendants' representations materially induced Plaintiff to purchase ET-Plus end terminals for installation along the county's roadways.  The installation of these ET-Plus end terminals have caused Plaintiff pecuniary loss, as these guardrails must now be replaced.

**SIXTH CLAIM FOR RELIEF**
**Breach of Express Warranty**
**(On Behalf of the Statewide Class)**

143.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

144.     Plaintiff brings this Count on behalf of the Statewide Class.

145.     Defendants expressly represented and warranted to Plaintiff and the Class Members by and through oral and written statements and affirmative certifications to the FHWA, Wisconsin Department of Transportation, and other regulatory agencies, as well as descriptions, and affirmations of fact in marketing materials, its web site, and other written materials intended for consumers, that the modified ET-Plus end terminals was approved for installation on state highways and was safe and fit for its proper and intended uses.

146.     After its 2005 undisclosed changes, Trinity's website falsely stated that the ET-Plus had been approved by all applicable regulatory authorities.  Trinity also affirmed in required certifications and on its website that the modified ET-Plus was NCHRP 350-compliant.

147.     These express warranties related to and covered qualities and features of the ET-Plus that were unavoidably material to Plaintiff and Class Members.

148.    Plaintiff and the Class members relied upon these express warranties in purchasing ET-Plus end terminals.

149.    At the time they made these express warranties, Defendants knew the purpose for which the ET-Plus end terminals were intended to be used, and warranted the units as safe and fit for such purposes.

150.    At the time they made these express warranties, Defendants knew the ET-Plus units did not conform to their express representations because the modified ET-Plus units contained latent defects in their design, material, and workmanship, and because the units were never tested to be compliant with NCHRP 350 required tests, nor was this disclosed to or approved by any regulatory authority including Plaintiff.

151.    Defendants nevertheless continued to market the ET-Plus by means of false and misleading information.

152.    The ET-Plus end terminals purchased by Plaintiff and Class Members did not conform to Defendants' promises, descriptions, or affirmations of fact because they are not free from defects in design and/or materials, and because they were not NCHRP 350-compliant or government approved.

153.    Plaintiff and Class Members have incurred damages as described herein as a direct and proximate result of Defendants' misrepresentations in their express warranty.

**SEVENTH CLAIM FOR RELIEF**
**Breach of Implied Warranty of Merchantability and Fitness for a Particular Purpose**
**(On Behalf of the Statewide Class)**

154.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

155.    Plaintiff brings this Count on behalf of the Statewide Class.

156.    Pursuant to Wisconsin Statutes § 402.314, implied in Trinity's sale of the ET-Plus was a warranty that the ET-Plus end terminals were of quality and fitness for which the units were intended to be used.

157.    Plaintiff and Class Members were buyers of the ET-Plus end terminals, and Defendants and their agents were sellers of the ET-Plus units, as those terms are defined by relevant statute.

158.    The ET-Plus end terminals were unmerchantable when they left Defendants' possession because they had the propensity to malfunction, and fail to perform and protect vehicle occupants when put to their intended and ordinary use.

159.    Plaintiff has only recently learned of Defendants' breach, and notification to Defendants is timely.

160.    Plaintiff and Class Members have incurred damages as described herein as a direct and proximate result of Defendants' breach of the warranty of merchantability.

161.    Similarly, the ET-Plus end terminals were not fit for the ordinary purpose for which guardrails are used.   This lack of fitness was caused by the defects and dangerous conditions described above.

162.    Defendants were well aware of the particular purpose Plaintiff and Class Members had in purchasing the ET-Plus end terminals.

163.    Plaintiff and Class Members relied on Defendants' skill and judgment to provide ET-Plus end terminals that would not malfunction, throat lock, and pose a danger to vehicle occupants during a crash.

164.    The secretly modified ET-Plus end terminals sold by Defendants were not fit for their intended purpose, as they do, in fact, malfunction, throat lock, and pose a danger to vehicle

occupants during a crash, resulting in the breach of implied warranties pursuant to Wisconsin Statutes § 402.314(2)(c).

165.    Plaintiff has only recently learned of Defendants' breach, and notification to Defendants is timely.

166.    Plaintiff and Class Members have incurred damages as described herein as a direct and proximate result of Defendants' breach of the warranty of fitness, and Plaintiff is entitled to all consequential damages identified in Wisconsin Statutes § 402.715(2)(b).

<u>**EIGHTH CLAIM FOR RELIEF**</u>
<u>**Unjust Enrichment**</u>
**(Pleading in the Alternative, on Behalf of the Nationwide and Statewide Classes)**

167.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

168.    Plaintiff asserts this claim in the alternative to the above-listed claims.

169.    Defendants have been unjustly enriched by their deceptive and unlawful conduct in relation to their sales of ET-Plus end terminals.

170.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred by such ill-gotten income.

171.    Plaintiff seeks disgorgement of all monies Defendants have obtained or derived from their unlawful trade practices and advertising.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for judgment as follows:

A.      An order certifying the proposed Classes designating Plaintiff as the named representative of the Classes, and designating the undersigned as Class Counsel;

39

B.     A declaration that the guardrails, as modified, are defective;

C.     A declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the modified guardrails;

D.     An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the modified guardrails;

E.     An award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.     A declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale of the defective guardrails, or make full restitution to Plaintiff and Class Members;

G.     An award of attorneys' fees and costs;

H.     An award of pre-judgment and post-judgment interest, as provided by law;

I.     Leave to amend this Complaint to conform to the evidence produced at trial; and such other relief as may be appropriate under the circumstances.


## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial as to all issues triable by a jury.

Respectfully submitted,

DATE:  May 28, 2015                    By: /s/Daniel E. Gustafson
                                       Daniel E. Gustafson
                                       Jason S. Kilene
                                       Sara J. Payne
                                       **GUSTAFSON GLUEK PLLC**
                                       Canadian Pacific Plaza
                                       120 South Sixth Street, Suite 2600
                                       Minneapolis, MN 55402
                                       Telephone:  (612) 333-8844
                                       Facsimile:  (612) 339-6622
                                       dgustafson@gustafsongluek.com

jkilene@gustafsongluek.com
spayne@gustafsongluek.com

Simon B. Paris
Patrick Howard
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA  19103
Telephone:  (215) 496-8282
Facsimile:  (215) 496-0999
sparis@smbb.com
phoward@smbb.com

Aaron N. Halstead
**HAWKS QUINDEL S.C.**
222 W. Washington Ave, Suite 450
P.O. Box 2155
Madison, WI 53701
Telephone:  (608) 257-0040
Facismile:  (608) 256-0236
ahalstead@hq-law.com

**Attorneys for Plaintiff and
Proposed Classes**